**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-0813-WJM-MEH

JOSHUA RUPNOW,
JOHN H. RUPNOW, and
DIANE M. RUPNOW,

    Plaintiffs,

v.

ALEXANDER M. PANIO, JR.,
MARY PANIO,
ADOLESCENT & FAMILY INSTITUTE OF COLORADO, INC., and
EDRA WEISS, M.D.,

    Defendants.

---

## ORDER ON PENDING MOTIONS TO DISMISS

---

In this action, Plaintiffs Joshua Rupnow, John Rupnow, and Diane Rupnow (collectively, "Plaintiffs") allege that they were defrauded, abused, and otherwise harmed by Defendants Alexander M. Panio, Jr. ("Panio" or "Alexander Panio"), Mary Panio, the Adolescent & Family Institute of Colorado, Inc. ("Institute"), and Edra Weiss, M.D. ("Weiss"). (*See* ECF No. 1.)  Currently before the Court are two Rule 12(b)(6) motions filed on the same day by Alexander and Mary Panio and the Institute (collectively, for purposes of this order, "Defendants").  The first-filed of these motions emphasizes that all of Plaintiffs' injuries were incurred between 1998 and 2000, and therefore seeks dismissal based on the statute of limitations and laches.  (ECF No. 27.)  The second-filed motion attacks various of Plaintiffs' claims on their elements.  (ECF No. 28.)

"All requests for relief under any part of Fed. R. Civ. P. 12 must be brought in a single motion." WJM Revised Practice Standard III.D.2. Defendants' second-filed motion is therefore improper and cannot be considered without endorsing a loophole to evade page limitations. The second-filed motion is therefore stricken. As for the first-filed motion, regarding the statute of limitations and laches, it is granted solely as to Plaintiffs' cause of action for battery, and otherwise denied.

## I. LEGAL STANDARD

"Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Shinn v. Melberg*, 2013 WL 1855852, at *1 (D. Colo. May 1, 2013) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)). As with all Rule 12(b)(6) arguments, however, the Court must "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

## II. FACTUAL ALLEGATIONS

The Court accepts the following assertions as true for purposes of Defendants' statute of limitations and laches arguments.

At some unspecified time in the 1980s or earlier, Panio founded the Institute and held it out as a family-focused inpatient center for treating substance-addicted youth. (ECF No. 1 ¶¶ 7, 17–19, 166.) Panio's wife, Mary Panio, co-owned the Institute. (*Id*. ¶ 3.) Weiss was the Institute's medical director. (*Id*. ¶ 4.)

As it turns out, Panio was entirely unqualified to run the Institute. He insisted on being referred to as "Dr. Panio" but he "was not a doctor, did not go to medical school, did not go to psychology school, was not licensed and had a PhD from an unaccredited diploma mill." (*Id*. ¶ 8.) Although Panio held himself out to be a clinical psychologist, he was not licensed as one. (*Id*. ¶ 12.) In fact, no one on staff at the Institute was professionally certified or licensed in any form of psychological or social therapy. (*Id*. ¶¶ 21, 23.)

Plaintiffs' interaction with the Institute began in the late 1990s. They were then living in Lincoln, Nebraska, when Joshua Rupnow began experimenting with illegal drugs in his early teen years. (*Id*. ¶ 151.) Hoping to give Joshua "a fresh start," his parents, John and Diane Rupnow, moved their family to Copper Mountain, Colorado, in 1998, but Joshua unfortunately continued his drug use. (*Id*. ¶¶ 152–53.) In the fall of 1998, at the age of 16, Joshua was arrested on drug charges. (*Id*. ¶ 153.) He was offered a plea bargain that required him to enroll in an inpatient drug treatment program. (*Id*. ¶ 154.) He accepted the plea bargain, and the prosecuting attorney referred Plaintiffs to the Institute. (*Id*. ¶ 155.)

John and Diane Rupnow researched the Institute and were told by its employees that "Dr. Panio" was a "nationally-known expert in the field of adolescent drug treatment." (*Id*. ¶ 156.) John and Diane were also told that the Institute specialized in finding the right medication and dosage for children with psychological ailments, which was important to John and Diane in light of the limited success they had seen so far with certain medications given to Joshua. (*Id*. ¶¶ 157–59.) Based on these and other

3

representations, John and Diane chose to place Joshua at the Institute. (*Id*. ¶ 160.) The precise date of admission is unclear, but Joshua's drug charge came in the "fall of 1998" and he was eventually discharged from the Institute in December 1998 (*id*. ¶¶ 153, 187), so the Court presumes that his admission took place in between those events.

Beginning with the initial intake meeting, Panio used "abusive," "crass," "vulgar," and "inappropriate" language with Plaintiffs. "John and Diane were shocked and dismayed" by this conduct but, in light of the representations about the Institute that had been made to them, they concluded that Panio's "unorthodox methods must be legitimate." (*Id*. ¶¶ 163–64.) Panio also ordered Joshua to be taken off all of his medications. (*Id*. ¶ 165.) John and Diane then signed an admission agreement that obligated them to pay the Institute $495 per day of Joshua's inpatient treatment. (*Id*. ¶ 167.)

Following his admission, Joshua was isolated from the outside world, and not allowed to correspond even with his parents. (*Id*. ¶ 173.) Institute staff forbade Joshua from discussing the Institute's methods with anyone outside the Institute. (*Id*. ¶¶ 174–75.) In group therapy sessions run by Panio and attended by Joshua, Panio would "go from patient to patient humiliating and verbally abusing [them] to make them feel worthless," then encourage other participants to do the same, and finally he would "ridicule the patients whose abuse of the fellow patient was not sufficiently mean." (*Id*. ¶¶ 176–79.) Panio directed vulgar and belittling language specifically at Joshua, and likewise accused him of ruining his parents' lives and marriage. (*Id*. ¶¶ 180–81.) "As a

result of this repeated abuse, Joshua came to believe that he was indeed a worthless human being." (*Id.* ¶ 182.)

Family therapy sessions followed a similar script. Panio would "focus[] his anger and hostility on a particular parent or set of parents, who[m] he would humiliate in front of other patients and family members. During these family sessions and group therapy sessions, Panio used crass, vulgar, harsh, a[b]rasive and abusive language directed at the parents, who[m] he blamed for the adolescents' problems." (*Id.* ¶ 183.) John and Diane were subject to this treatment, making them feel "uncomfortable," but "they continued to believe that Defendant Panio and the program were legitimate and well-regarded." (*Id.* ¶¶ 184, 186.)

As previously noted, Joshua was released from the Institute in December 1998. (*Id.* ¶ 187.) However, on account of the abuse received at the Institute, his mental health was worse than before and he quickly returned to abusing drugs. (*Id.* ¶ 188.)

For unclear reasons, Joshua "was readmitted" to the Institute in October 2000, this time for $595 per day. (*Id.* ¶ 189.) All of the previously described abusive practices repeated themselves during this second stay at the Institute. (*Id.* ¶¶ 190–94.) When Joshua was discharged later that year his "mental and psychiatric condition hit rock bottom," and he spent "most of the next fifteen years homeless and addicted to drugs, believing he was hopeless, worthless and at fault for his parents['] problems." (*Id.* ¶ 195.)

Over a decade later—in May 2014, specifically—John Rupnow saw a report on the CNN television network regarding the Institute. (*Id.* ¶ 197.)[1] The report describes

---

[1] The Complaint contains two paragraphs numbered 197. This citation refers to the instance of paragraph 197 found on page 45.

the Institute's abusive practices and announced that Panio did not have a legitimate doctoral degree and was not licensed to practice medicine or psychology. (*Id.* ¶¶ 198–200.) This was the first that Plaintiffs "had seen or heard any evidence or indication that Defendant Panio was not a doctor and/or was not a licensed professional in any capacity." (*Id.* ¶ 201.) John Rupnow then began researching Panio and learned of his "history of credentials and licensure fraud." (*Id.* ¶ 205.) "This research suggested to Plaintiffs, for the first time, that [the Institute's] overall program was substandard, fraudulent, abusive and neglectful." (*Id.* ¶ 206.)

Plaintiffs filed this action on April 11, 2016, asserting seven causes of action against the various Defendants:

1. negligence, "including battery and lack of informed consent" ("Count One");
2. violation of the Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. §§ 18-17-101 *et seq.* ("Count Two");
3. violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* ("Count Three");
4. breach of fiduciary duty ("Count Four");
5. unauthorized practice of medicine ("Count Five");
6. fraud, including fraud in the inducement, fraudulent concealment, and fraudulent nondisclosure ("Count Six"); and
7. civil conspiracy ("Count Seven").

To support certain of these causes of action, Plaintiffs have alleged the experiences of three other families that suffered similar abuse at the Institute between 2008 and 2010. (*Id.* ¶¶ 33–150.)

### III.  ANALYSIS

#### A.  Statute of Limitations Arguments

Defendants argue that Plaintiffs' claims are all too late in light of the relevant statutes of limitations. Defendants assert, and Plaintiffs do not contest, that the following limitations periods apply:

- to the extent Count One is asserted against the Institute (a healthcare provider), "two years after the date that such action accrues . . . but in no event shall an action be brought more than three years after the act or omission which gave rise to the action," Colo. Rev. Stat. § 13-80-102.5(1);

- to the extent Count One is a simple battery claim, "one year after the cause of action accrues," Colo. Rev. Stat. § 13-80-103(1)(a);

- to the extent Count One is a simple negligence claim, "two years after the cause of action accrues," Colo. Rev. Stat. § 13-80-102(1)(a);

- for Count Two (COCCA violations), also two years, Colo. Rev. Stat. § 13-80-102(1)(i);

- for Count Three (CCPA violations), "within three years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice," Colo. Rev. Stat. § 6-1-115;

- to the extent Count Four (breach of fiduciary duty) is asserted against the Institute (a healthcare provider), "two years after the date that such action accrues . . . but in no event shall an action be brought more than three years after the act or omission which gave rise to the action," Colo. Rev. Stat. § 13-80-102.5(1);

- to the extent Count Four is asserted against the Panios, "within three years after the cause of action accrues," Colo. Rev. Stat. § 13-80-101(1)(f);

- for Count Five (unauthorized practice of medicine), two years, Colo. Rev. Stat. § 13-80-102(1)(i);

- for Count Six (fraud), three years, Colo. Rev. Stat. § 13-80-101(1)(c); and

- for Count Seven (civil conspiracy), the same limitations period as the underlying cause of action that supports the civil conspiracy claim.

In Colorado, causes of action usually accrue when the injured party discovers or should have discovered the injury and its cause. *See generally* Colo. Rev. Stat. § 13-80-108. In this light, Defendants claim that Plaintiffs knew of—or at least should have suspected—their injuries and their corresponding causes as early as 1998, when they first experienced the Institute's abusive treatment and were admittedly "shocked and dismayed" by it. Or, at the very latest, they knew they had been injured by the time of Joshua's second discharge in December 2000, when he was at "rock bottom" on account of the abuse.[2]

---

[2] Alternatively, Defendants attach to their motion Denver Post and Channel 7 news reports regarding accusations against the Institute and Panio's lack of *bona fide* educational

Plaintiffs do not respond to Defendants' arguments on a count-by-count basis. Plaintiffs instead assert that Defendants should be estopped from arguing the statute of limitations, or at least that Plaintiffs deserve equitable tolling due to Defendants' alleged fraudulent concealment of the underlying facts, such as Panio's lack of a legitimate Ph.D. (ECF No. 33 at 11–13.) Plaintiffs also assert that whether they were reasonably diligent in discovering their injuries is a fact question that cannot be resolved at this stage. (*Id*. at 10.) *Cf. Salazar v. Am. Sterilizer Co.*, 5 P.3d 357, 363 (Colo. App. 2000) ("The time when a plaintiff discovered, or through the use of reasonable diligence should have discovered, the negligent conduct is normally a question of fact that must be resolved by the trier of fact."). For the reasons explained below, the Court defers ruling on the estoppel and tolling arguments, but agrees under these circumstances that reasonable diligence is a question of fact.

The Colorado Supreme Court has endorsed "the doctrine of equitable estoppel when application of a statute of limitations will lead to an unjust result." *Shell W. E&P, Inc. v. Dolores Cnty. Bd. of Comm'rs*, 948 P.2d 1002, 1007 (Colo. 1997). However, Plaintiffs have failed to point the Court to a case showing that it can apply estoppel on disputed facts at the pleading phase. The Court therefore finds estoppel inappropriate in the present circumstances.

---

qualifications. (*See* ECF Nos. 27-1 through 27-8.) All of these reports were written in the first half of 2012. Defendants accordingly argue that there was enough publicly available information in early 2012 to trigger the running of the statute of limitations. Given that the longest of the applicable limitations periods is three years, Defendants say that Plaintiffs needed to file their lawsuit no later than sometime in 2015, but they did not do so until April 2016. However, these materials are outside the pleadings, and are not suitable for any exception (they are not public records, not judicially noticeable, etc.). The Court will not at this stage consider any argument based on these exhibits.

Equitable tolling can apply "where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner." *Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996). It is not clear, however, that Defendants somehow "prevented" Plaintiffs from discovering their claims earlier. This lack of clarity partly comes through the unique way the Colorado Supreme Court has treated the notion of "concealment," which is the basis for Plaintiffs' assertion that they could not have learned of their claims earlier.

If "concealment" were at issue as that term is commonly understood, Plaintiffs would have a difficult argument. In common discourse, "concealment" usually implies some sort of affirmative effort to prevent discovery. There are no allegations that Defendants took steps to make it difficult for anyone, including Plaintiffs, to discover Panio's lack of a real doctorate, the Institute's lack of accredited staff members, and so forth. And, although Plaintiffs allege that Institute staff members instructed patients not to discuss Institute treatment techniques with those outside the Institute (ECF No. 1 ¶¶ 174–75), it is obvious that Plaintiffs nonetheless knew what the Institute was doing at the time they were associated with it (*e.g.*, verbal abuse, psychological manipulation, termination of drug prescriptions). Plaintiffs instead allege that they could not have discovered their injuries earlier for two reasons having nothing to do with "concealment" in the normal sense: (1) Defendants' misrepresentations about their qualifications made such an impression that Plaintiffs did not even think to question the Institute's techniques, despite Plaintiffs' immediate shock and dismay; and (2) at the time Joshua was a patient of the Institute, "it was extremely difficult to research the background, credentials and licensure of [Institute] staff," and also difficult "to research lawsuit

history" (ECF No. 1 ¶ 202)—implying that the facts forming the basis of Plaintiffs' claims were in fact publicly accessible, just difficult to access.

However, the Colorado Supreme Court treats the notion of "concealment" much more liberally than its common meaning implies. An example with direct application to this case is *Smith v. Boyett*, 908 P.2d 508 (Colo. 1995), where that court interpreted the same two-year statute of limitations that Defendants now raise as to any claim asserted against the Institute, Colo. Rev. Stat. § 13-80-102.5(1).[3] Both the two-year limitations period and the three-year repose period also contained in the statute are subject to an exception that reads as follows: "If the act or omission which gave rise to the cause of action was knowingly concealed by the person committing such act or omission, . . . the action may be maintained if instituted within two years after the person bringing the action discovered, or in the exercise of reasonable diligence and concern should have discovered, the act or omission." Colo. Rev. Stat. § 13-80-102.5(3)(a). "Knowingly concealed," more than just "concealed," seems to suggest an affirmative act intended to make information inaccessible, but the Colorado Supreme Court explicitly rejected such a construction. *See Smith*, 908 P.2d at 513 n.10. It instead held that a plaintiff could show knowing concealment for purposes of the statute simply by showing that the defendant intentionally failed to disclose material information and that such failure to disclose somehow "impeded . . . discovery of th[e] negligence." *Id*. at 513.

Since *Smith*, the Colorado Supreme Court has consistently treated fraudulent concealment and fraudulent nondisclosure as interchangeable, with both theories

---

[3] At the time of *Smith*, this statute was codified at § 13-80-105.

turning on the defendant's failure to disclose material information that the defendant had a duty to disclose. *See Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998). Thus, it would seem that any matter under Colorado law turning on "concealment" can also be satisfied by material nondisclosure. *See also* Colo. Jury Instr., Civil 19:6, Source and Authority cmt. 2 (2016) (noting that Colorado cases discussing concealment actually "refer[] to a knowing nondisclosure of a material fact . . . rather than an affirmative act of concealment"). And this could apply to the statute of limitations. *First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1987) ("fraudulent concealment as a basis for tolling statutes of limitation").

Even so, all of the potentially relevant statutes and case law regarding accrual and tolling still incorporate the concept that a reasonable plaintiff at some point *should have known* of a cause of action. In other words, just because a fact has been concealed (actively or by failure to disclose) does not necessarily mean it is unknowable by the outside world; and in any event, to the extent equitable tolling applies, it must "run out" at some point.

In this case, that analysis turns out to be indistinguishable from the basic analysis of when these Plaintiffs knew or reasonably should have known of their claims. If a jury, for example, agreed that Defendants' actions prevented Plaintiffs from discovering their claims before the May 2014 CNN report, then the Court would likely have a basis to apply equitable tolling—and perhaps even equitable estoppel—to prevent Defendants from gaining an advantage through their obstruction. *First*

*Interstate*, 744 P.2d at 1200 ("where the defendant engages in fraudulent concealment of facts pertinent to the existence of a claim and is successful in concealing those facts until the limitation period has run, it cannot be said that declining to toll the statute of limitation promotes the interests of justice"). Conversely, if a jury found otherwise—*e.g.*, if it found Plaintiffs not credible in their assertion that, despite their immediate shock and dismay, they suspected no injury until May 2014—then there would appear to be no basis to toll the statute of limitations, or to estop Defendants from asserting it.

The Court agrees with Plaintiffs that this cannot be resolved on the pleadings, but instead remains a fact question for summary judgment or trial, with one exception. That exception is Count One's battery theory, which must be brought within one year of its accrual. Colo. Rev. Stat. § 13-80-103(1)(a). Plaintiffs themselves acknowledge that all of their claims accrued in May 2014 (ECF No. 1 ¶ 209), but they did not bring this lawsuit until April 2016. Their battery theory is therefore untimely as a matter of law and will be dismissed with prejudice. All other theories survive Defendants' statute-of-limitations attack at this stage.

**B.     Laches**

Defendants also claim that all of Plaintiffs' claims should be barred by the equitable doctrine of laches. (ECF No. 27 at 13–15.) This argument fails for two reasons.

First, "full knowledge of the facts" is an element of laches. *See Herald Co. v. Seawell*, 472 F.2d 1081, 1099 (10th Cir. 1972) ("the[] elements [of laches] are (1) full

knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another"). But that is precisely the fact question that remains here: whether and when Plaintiffs had full knowledge of the facts that would justify this lawsuit.

Second, "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1973 (2014). In most circumstances, "[l]aches within the term of the statute of limitations is no defense at law." *United States v. Mack*, 295 U.S. 480, 489 (1935), *quoted with approval in Petrella*, 134 S. Ct. at 1973. Here, Plaintiffs are asserting legal (not equitable) claims, all of which have a legislatively prescribed limitations period that contemplates inability to file due to inability to discover the necessary facts. Defendants have given this Court no reason to override that legislative judgment, which already accounts for the possibility that a claim will be brought long after the injury took place.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Dismiss Based on Statute of Limitations and Laches (ECF No. 27) is GRANTED IN PART and DENIED IN PART as follows:

    a. The Motion is GRANTED with respect to the portion of Plaintiffs' Count One alleging battery, and that theory of relief is DISMISSED WITH PREJUDICE;

        b.      The Motion is otherwise DENIED; and

2.      Defendants' Motion to Dismiss for Failure to State a Claim (ECF No. 28) is STRICKEN.

Dated this 2nd day of March, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge